UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                Plaintiff,

       v.

TORRIE SINGLETON,

                Defendant.

_____

<u>REPORT & RECOMMENDATION</u>

06-CR-6234L

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. David G. Larimer, United States District Judge, dated October 10, 2007, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 48).

Defendant Torrie Singleton is charged in a three-count indictment. The first count charges Singleton with possessing marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). The second count of the indictment charges Singleton with possessing a firearm in furtherance of the offense charged in the first count, in violation of 18 U.S.C. § 924(c)(1). The final count charges Singleton with possessing a firearm after having previously been convicted of crimes punishable by terms of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Each of the counts alleges that the charged crime occurred on or about May 19, 2006. (Docket # 15).

Currently before this Court for Report and Recommendation are Singleton's motions to suppress statements and physical evidence seized from his residence at 119 Saratoga Avenue. (Docket # 21).[1] The government opposes both motions. (Docket # 23).

## FACTUAL BACKGROUND

### I.  Procedural History

An evidentiary hearing was conducted before this Court on June 4, 2007. During that hearing, the government presented the testimony of Officers Robert DiNicola and Kenneth Coniglio of the Rochester Police Department, who testified about Singleton's arrest on May 19, 2006. (Docket # 41).[2] On that date, both were assigned to a tactical police unit known as "Operation Impact," the mission of which was "to aggressively enforce the law to get the guns and drugs off the street." (Tr. 4, 46). No witnesses were called by the defense.

Following the receipt and consideration of post-hearing submissions, this Court requested supplemental briefing. To explain its request, the Court conducted a conference in open court in which it expressed its view that the encounter between Officer Coniglio and Singleton constituted a *Terry* stop and that the question of whether it was supported by reasonable suspicion was an extremely close one. The Court directed counsel to review the Second Circuit's recent decision in *United States v. Elmore*, 482 F.3d 172 (2d Cir. 2007), which

---

[1] Singleton's omnibus motions also sought, *inter alia*, discovery and inspection, *Jencks* material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, the preservation of rough notes and bifurcation. (Docket # 21). Each of these requests was either resolved by the parties or decided in open court by the undersigned on May 3, 2007. (Docket ## 36, 37).

[2] The transcript of the suppression hearing conducted before this Court on June 4, 2007, shall hereinafter be referenced as "Tr. __." (Docket # 41).

examines the relationship between the reliability of an informant and the necessity or

non-necessity of corroboration of the informant's information.  As to the question of reliability,

the Court requested counsel to consider whether reasonable suspicion may ever be based upon

information from an informant with a proven track record of reliability where the basis of

knowledge of the information is unknown.  The requested supplemental briefs have now been

filed, and this Report and Recommendation reflects this Court's analysis of the still very difficult

questions posed by the facts of this case.


## II.  The Suppression Hearing

Having heard and carefully considered the testimony offered by Officers DiNicola

and Coniglio, I find that each officer was a credible witness.  Because of discrepancies in their

testimony, the significance of which is vigorously disputed by the parties, the testimony of each

will be separately summarized below.

**A.  Officer DiNicola's Testimony:**  Officer DiNicola testified that on May 19,

2006, at approximately 9:00 p.m., he received a telephone call from a "concerned citizen" who

provided information relating to alleged criminal activity by an individual "staying at" 119

Saratoga Avenue.  (Tr. 4-5).  According to DiNicola, the citizen reported that a black male

staying at that address was "selling drugs from that location and had a handgun."  (Tr. 5).  The

citizen also reported that the individual in question had recently left the residence and "had gone"

to a nearby store on the south side of Lyell Avenue.  (Tr. 6-7, 22).  Although the citizen offered

no physical description of the individual beyond race and gender, she described the clothing he

was wearing:  tan boots, gray sweat pants and a long-sleeved shirt.

DiNicola testified that the 9:00 p.m. call was the only telephone contact he had with the citizen on May 19th and that he could not recall when he had last spoken to her before the 19th. (Tr. 15).

The "concerned citizen" was an individual whom DiNicola had known for over six years. (Tr. 10). She lived in the "area" near 119 Saratoga Avenue, which DiNicola described as a "high-crime area" because of its heavy incidence of shootings, drug activity and prostitution, and "happens to be on the street all the time." (Tr. 5, 6, 9). Moreover, on previous occasions, she had provided reliable information to DiNicola about "drug houses, weapons, guns, stuff like that" that had led to multiple handgun seizures and drug arrests. (Tr. 6). DiNicola testified that he had had contact with the citizen informant on over twenty prior occasions. (Tr. 9). She was neither a paid informant, nor an informant who faced the possibility of criminal charges. (Tr. 9-10, 19).

After speaking with the concerned citizen, DiNicola immediately telephoned Officer Coniglio and "relayed the information" he had received from her. (Tr. 7, 13). Although he subsequently responded to the scene, his later activities are not pertinent to this motion.

**B. Officer Coniglio's Testimony:** Officer Coniglio testified that at approximately 9:15 p.m. on May 19, 2006, he received a telephone call from DiNicola. (Tr. 21). On direct examination, he described the contents of the call as follows:

> Officer DiNicola . . . let me know that an individual had called him with some information that an individual that lived at 119 Saratoga Avenue was dealing drugs and that individual was out on the street now, possibly walking towards his house.

(Tr. 21).  He also stated that DiNicola had provided him with the informant's description of the male suspect's clothing (long-sleeved t-shirt, gray sweat pants and tan boots) and his current location (a store located at 199 Lyell Avenue).  (Tr. 22).  According to Coniglio, DiNicola did not mention a gun in the 9:00 p.m. telephone call to him.  (Tr. 51).  On cross-examination, Coniglio clarified that "some days previous" to May 19th, DiNicola had told him that one of his informants reported that someone was dealing drugs from 119 Saratoga Avenue and had a handgun "there."  (Tr. 49, 50).  Coniglio testified that he did not know when the informant first had advised DiNicola of this information.  (Tr. 49).  He also testified that prior to May 19th, "we drove by the house to check out activity, [but] we never saw [any]."  (Tr. 50).

        In response to DiNicola's call, Coniglio and his partner drove their marked patrol car to the intersection of Saratoga and Lyell Avenues and parked their patrol car in a nearby alley. (Tr. 21, 25).  Although the officers were not able to see the grocery store from their location, they were able to watch "somewhat" the intersection of Saratoga and Lyell Avenues.  (Tr. 23).  Within a few minutes, the officers observed a male wearing a long-sleeved shirt, gray sweat pants and tan boots – later identified as Singleton – walk northbound on Saratoga; he was carrying a grocery bag.  (Tr. 8, 22-24, 27).  Coniglio initially approached Singleton by car, parked and exited the car, and then approached him on foot.  Singleton stopped walking, and Coniglio asked him, "Do you got a minute?"  (Tr. 24-25).  Singleton responded, "Sure," and Coniglio directed him to place his hands behind his back while he conducted a pat frisk for weapons.  (Tr. 26). Coniglio explained that he performed the patdown for officer safety because "with the information we had, this individual was supposed to be carrying a gun."  (Tr. 26-27, 52).

Coniglio placed Singleton's hands behind his back, "interlac[ing] his fingers" and holding them with one of his hands; as he did so, he searched Singleton from head to foot over his clothing. (Tr. 27-28). During the search, Coniglio employed his "standard line of chatter" and asked Singleton, "Do you have anything on you I need to know about? Any guns, knives, drugs, anything that is going to stick me, poke me, hurt me, stab me, cut me, make me feel pain? Are you on probation or parole? When was the last time you were arrested?" (Tr. 30). Singleton replied that he did not have anything on him and that he was on parole. (Tr. 30, 55). Coniglio then asked Singleton whether he had a curfew, and Singleton replied, "9 o'clock." (Tr. 31).

Following the search, Coniglio released Singleton's hands and continued talking with him in a "conversational tone." (Tr. 29). Although Coniglio testified that Singleton was free to leave at this point, the officers had positioned themselves on either side of Singleton and within three or four feet. The purpose of this positioning, Coniglio testified, was to ensure that they had "an angle to cut him off" if Singleton tried to run. (Tr. 29, 31-32, 53). Coniglio next asked Singleton for identification, and Singleton gave him a New York State identification card. (Tr. 28, 33). Coniglio ran a records check, which confirmed that Singleton was in fact on parole, and also contacted parole officials, who confirmed that Singleton was violating his 9:00 p.m. curfew. (Tr. 34). Based upon that information, Singleton was placed in the rear of Coniglio's police vehicle, and an on-duty parole officer was requested to respond to the scene. (Tr. 34-35). The parole officer arrived and arrested Singleton.

Following Singleton's arrest, a search was conducted of his residence.  (Tr. 35).

During the search, a handgun and 2.7 ounces of marijuana were discovered.  (Tr. 35).[3]  Singleton

was then transported to the Monroe County Public Safety Building and placed in an interview

room, where he was handcuffed to the table.  (Tr. 35, 36).  Coniglio entered the room shortly

after midnight, obtained Singleton's pedigree information and recorded such information on a

Rochester Police Department notification and waiver form.  (Tr. 36-37; G.Ex. 1).  Before

conducting an interview, Coniglio advised Singleton of his *Miranda* rights by reading verbatim

from the notification form.  (Tr. 37).  Specifically, Coniglio advised:

> 1.  You have the right to remain silent – you do not have to say anything if you don't want to.
>
> 2.  That anything you do say can be used against you in a court of law.
>
> 3.  You have the right to talk to a lawyer before answering any questions and have him here with you.
>
> 4. If you can't pay for a lawyer, one will be given to you before any questioning if you wish.
>
> 5.  If you do wish to talk with me, you can stop at any time.

---

[3]  DiNicola testified that Singleton consented to the search (Tr. 16), but the voluntariness of the consent is not before this Court because Singleton has not submitted an affidavit establishing standing to challenge the search, despite being offered multiple opportunities by the Court to submit an affidavit demonstrating the requisite privacy interest in the premises searched.  *See e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (defendant seeking to suppress must demonstrate by a preponderance of the evidence that he had a reasonable expectation of privacy in the location or items searched); *United States v. Fields*, 113 F.3d 313, 320 (2d Cir.) (courts generally evaluate standing by considering "whether the defendant had any property or possessory interest in the place searched or the items seized"), *cert. denied*, 522 U.S. 976 (1997); *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (defendant bears burden of establishing standing); *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (citations omitted) ([b]urden "is met only by sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge[;] [a] defendant's unsworn assertion of the Government's representations does not meet this burden").

(G.Ex. 1).  After reading these rights, Coniglio asked Singleton whether he understood his rights and whether he wished to waive such rights and speak with him.  Singleton responded "Yeah" to both questions.  (Tr. 38-39, 59; G.Ex. 1).  Coniglio thereafter questioned Singleton about the handgun and narcotics seized from his residence.  (Tr. 40).

       At no time during the interview did Singleton indicate that he did not understand what was happening or that he did not want to talk.  (Tr. 45).  Singleton did not complain of any injuries or illnesses, nor did he appear to be under the influence of alcohol or drugs.  (Tr. 40-41).  According to Coniglio, no threats or promises were made to Singleton in order to induce him to provide a statement.  (Tr. 44).

       Once the questioning concluded, Coniglio left the interview room and reduced Singleton's statement to writing.  Coniglio then returned to the room, read the statement and presented it to Singleton for his signature.  (Tr. 41-42; G.Ex. 2).  Singleton refused to sign the written statement, stating only, "I've been through the system before."  (Tr. 61).  Coniglio then terminated the interview, and Singleton was transported to booking.  (Tr. 42).

## DISCUSSION

       Singleton moves to suppress statements made by him, as well as the handgun and narcotics seized from 119 Saratoga Avenue.  According to Singleton, his stop by Coniglio was a non-consensual *Terry* stop that lacked reasonable suspicion.  He further maintains that the evidence and statements subsequently obtained that evening must be suppressed as fruit of that unlawful stop.  (Docket ## 21, 46).  The government disagrees with both arguments.

I. **Stop of Singleton**

        The first question this Court must resolve is whether the interaction between Coniglio and Singleton implicated and, if so, violated Singleton's Fourth Amendment rights. The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV.  Within the framework of the Amendment, interactions between private citizens and law enforcement officials may be categorized into one of three types: consensual encounters, investigative detentions, or arrests.  *See United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995).  To implicate the Fourth Amendment, the interaction must amount to either an investigative detention or an arrest; a consensual encounter, by contrast, does not trigger the protections of the Amendment.  *Id.*

        The most intrusive of the three types of interactions is the arrest, which requires a showing of probable cause.  For a warrantless arrest to be valid under the Fourth Amendment, the arresting officers must have probable cause to make the arrest at the time it is made.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  "[I]n general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested."  *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (citations omitted).  "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, . . . but must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'"  *Id.* (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)); *see Wong Sun v. United States*, 371 U.S. 471, 479 (1963).

The second type of interaction between law enforcement and private citizens is an investigative detention, often referred to as a *Terry* stop. A *Terry* stop constitutes a more limited seizure than an arrest within the meaning of the Fourth Amendment and thus requires a more modest showing by the government, namely, reasonable suspicion to believe that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or hunch," *United States v. Elmore*, 482 F.3d at 178 (internal quotation omitted); rather it must be supported by "specific and articulable facts, of unlawful conduct." *United States v. Scopo*, 19 F.3d at 781 (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)). Reasonable suspicion, like probable cause, is judged upon the totality of the circumstances and does not require the quantum of proof necessary to establish probable cause or a preponderance of the evidence. *Elmore*, 482 F.3d at 179. An officer conducting a *Terry* stop is permitted to detain the individual briefly "in order to investigate the circumstances that provoke[d] suspicion." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). During the stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* The detainee is not required to respond, however, and must thereafter be released unless his or her answers provide the officer with probable cause for an arrest. *Id.*

The final and least intrusive of the three interactions is the consensual encounter. A consensual encounter requires no justification – either by probable cause or reasonable

suspicion – because the citizen is not seized, and thus no constitutional rights are implicated. *See United States v. Adegbite*, 846 F.2d 834, 837 (2d Cir. 1988) ("only if they were seized are defendants vested with any right to constitutional safeguards") (quoting *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988)).  As the Supreme Court has recognized, "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." *Terry v. Ohio*, 392 U.S. at 20 n.16.

On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant in fact subjected him to a search or seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996).  Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *United States v. Bayless*, 921 F. Supp. at 213, that the search or seizure did not violate the Fourth Amendment. *United States v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

In analyzing whether a particular encounter was consensual or whether it constituted a seizure, the Court must "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that

11

the person was not free to decline the officers' requests or otherwise terminate the encounter."

*Florida v. Bostick*, 501 U.S. 429, 439 (1991)*; see also Brendlin v. California*, 127 S. Ct. 2400, 2405-06 (2007); *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991). According to the Second Circuit, those circumstances include the following factors, the presence of which suggest that a seizure has occurred:

> [T]he threatening presence of several officers; the display of a
> weapon; physical touching of the person by the officer; language or
> tone indicating that compliance with the officer was compulsory;
> prolonged retention of a person's personal effects, such as airplane
> tickets or identification; and a request by the officer to accompany
> him to the police station or a police room.

*United States v. Hooper*, 935 F.2d 484, 491 (2d Cir.) (citations omitted), *cert. denied*, 502 U.S. 1015 (1991). During a consensual encounter, law enforcement is not required to advise the citizen that he or she is free to leave or terminate the questioning. *See id.* at 492.

In the case at bar, Singleton alleges that he was unlawfully seized by the officers when they stopped him on the street and subjected him to a pat frisk. As an initial position, the government argues that the interaction between Singleton and the officers was consensual until he revealed that he was on parole and out past his curfew. (Docket # 43 at 3-9).

This position ignores the fact that Singleton was physically restrained during the encounter in order to permit Coniglio to perform a pat frisk. I agree with the government that until this occurred, the encounter was consensual. Neither officer ordered Singleton to stop or seized him to prevent him from walking away. Neither officer approached him with his weapon drawn. Rather, the officers simply asked if Singleton had "a minute." Nothing about these

events should have caused a reasonable person in Singleton's position to conclude that he was not free to leave or terminate the encounter.

Simply because an encounter begins as a consensual one does not, of course, mean that subsequent actions taken or statements made by the police may not transform the encounter into a non-consensual one for Fourth Amendment purposes. Here, the first action undertaken by Coniglio after Singleton agreed to talk to the officers was to direct Singleton to put his hands behind his back so that Coniglio could perform a pat frisk for weapons. Coniglio then held Singleton's hands with one of his and searched the outside of Singleton's clothing with his other. During this physical restraint, Coniglio learned by questioning Singleton that he was on parole and was on the street past his curfew.

On this record, I easily conclude that the consensual encounter quickly evolved into a *Terry* stop upon Coniglio's direction to Singleton to put his hands behind his back and restraint of him in order to conduct the patdown. The law is well-settled that a pat frisk is a "search" and a momentary detention is a "seizure" under the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 498 (1983) (a person "may not be detained even momentarily without reasonable, objective grounds for doing so"); *Terry*, 392 U.S. at 16 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.'"). In this case, Singleton was not free to leave when he was being restrained, and it was during this period of physical restraint that Coniglio elicited Singleton's admissions that he

was on parole and had a 9:00 p.m. curfew.  These admissions, once confirmed by Coniglio, led to

Singleton's arrest by parole officers.[4]

Having concluded that Coniglio's actions amounted to a *Terry* stop, the critical

question is whether the stop was supported by reasonable suspicion to believe that "criminal

activity may [have] be[en] afoot."  *Terry*, 392 U.S. at 30.  Before undertaking to answer that

question, it is useful to review the relevant caselaw concerning (1) the quantum of evidence

necessary to amount to reasonable suspicion; and (2) the manner in which that evidence may be

demonstrated to be reliable.  I will address each in turn.

A.  **Reasonable Suspicion:**  As the Supreme Court explained in the seminal *Terry*

decision, reasonable suspicion to justify an investigative detention must be based upon "specific

and articulable facts which, taken together with rational inferences from those facts, reasonably

warrant [the] intrusion" on a citizen's Fourth Amendment interests.  *Terry*, 392 U.S. at 21.  Just

as with probable cause, reasonable suspicion is to be determined on the totality of the

circumstances, but need not rise to the level of probable cause and indeed falls below the

preponderance of the evidence standard.  *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002).

Put another way:

> Reasonable suspicion is a less demanding standard than probable
> cause not only in the sense that reasonable suspicion can be
> established with information that is different in quantity or content
> than that required to establish probable cause, but also in the sense
> that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause. . . . Reasonable

---

[4]  The government's argument that the encounter resumed its consensual character once the frisk was
completed is an issue the Court need not resolve because Singleton's incriminating admissions were made while he
was being detained.  Notably, the government did not elicit testimony that Coniglio would have run a records check
in the absence of Singleton's admissions – a fact upon which an inevitable arrest theory then may have been
predicated.

> suspicion, like probable cause, is dependent upon both the content
> of information possessed by police and its degree of reliability.
> Both factors – quantity and quality – are considered in the totality
> of the circumstances.

*Alabama v. White*, 496 U.S. 325, 330 (1990) (citations omitted).

    **B.  Reliability:**  Reasonable suspicion to justify a *Terry* stop may be based upon information provided by a confidential informant so long as the information is sufficiently reliable.  *Adams v. Williams*, 407 U.S. 143, 147 (1972); *Elmore*, 482 F.3d at 179.  While the assessment of reliability is to be made based upon the totality of the circumstances, "the informant's 'basis of knowledge' and 'veracity' (*i.e.*, how he knows and why we should believe him) remain highly relevant to a determination of . . . reasonable suspicion."  *Elmore*, 482 F.3d at 179 (citing *Alabama v. White*, 496 U.S. at 328-29).  The Second Circuit has explained that the "basis of knowledge" inquiry examines "the quality of [the informant's] sources of knowledge of the information."  *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993).  In other words, the Court must assess whether the informant's allegations are based on reliable sources, "such as first-hand observations or second-hand information from reliable sources, rather than on unreliable means such as rumor or innuendo."  *Id.*

    Informant information that, standing alone, does not adequately demonstrate the informant's veracity and basis of knowledge may still amount to reasonable suspicion if it is sufficiently corroborated by law enforcement investigation.  *Elmore*, 482 F.3d at 179 (citing *Draper v. United States*, 358 U.S. 307 (1959)).  As to the balance between reliability and corroboration, the Second Circuit has noted:

> [I]t is useful to think of known reliability and corroboration as a
> sliding scale.  Where the informant is known from past practice to

> be reliable, as in [*Adams v.*] *Williams*, no corroboration will be
> required to support reasonable suspicion.  Where the informant is
> completely anonymous, as in [*Alabama v.*] *White*, a significant
> amount of corroboration will be required.

*Id.* at 181.

      **1. Veracity of the Informant:**  Two critical factors lead me to conclude easily that the informant in this case should be considered credible, namely, that she was known and not anonymous and that she had an established history of providing reliable tips about similar criminal activity.  As Officer DiNicola testified, the informant's identity was known to him.  *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("a known informant['s] . . . reputation can be assessed and [she] can be held responsible if her allegations turn out to be fabricated").  She was a concerned citizen and not a paid informant or cooperating witness.  *See Elmore*, 482 F.3d at 180 ("[t]he veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted"); *Caldarola v. Calabrese*, 298 F.3d 156, 165-66 (2d Cir. 2002).

      Moreover, the informant was an individual with whom DiNicola had an established relationship spanning over six years.  During that time, she had provided information to him on over twenty occasions; her information had led to multiple drug arrests and handgun seizures.  (Tr. 6, 9-10).  This "proven track record of providing reliable tips," *id.*, coupled with her status as a known citizen informant, compel me to characterize her veracity as strong.  *See United States v. Mims*, 2005 WL 3466553, *6 (D. Conn. 2005), *aff'd*, 237 F. App'x 634 (2d Cir. 2007).

16

**2. Basis of Knowledge of the Informant:**  By contrast to her veracity, the record before this Court contains little, if any, information upon which to assess the informant's basis of knowledge.  According to DiNicola, the informant advised him that a black male who was "staying at" 119 Saratoga Avenue "was selling drugs from that location and had a handgun."  (Tr. 5).  She further advised DiNicola on May 19, at approximately 9:00 p.m., that he had gone to a store on the south side of Lyell Avenue and described his clothing – tan boots, gray sweat pants and a long-sleeved shirt.  (Tr. 6-7).

No information was elicited by the government at the hearing to suggest that the informant provided any detailed information to flesh out her very general and conclusory allegations of criminal conduct, such as, whether she herself had observed drug sales or a firearm or had learned the information from someone else; whether the alleged drug activity had occurred on one, more than one or repeated occasions; when such activity had occurred; what type of firearm was involved; when the firearm-related activity had occurred; where the firearm was located (*i.e.*, in the residence, on his person or in his car).  *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (tip from reliable informant that was "specific, detailed and contemporaneous" contributed to reasonable suspicion to detain defendant); *see also Illinois v. Gates*, 462 U.S. 213, 239 (1983) ("mere conclusory statement" that "'affiants have received reliable information from a credible person and believe' that heroin is stored in a home" insufficient to demonstrate probable cause for search warrant).  In the absence of any of this information, the Court must assume that the informant stated only that an individual – whom she

17

identified by race, gender and a detailed description of his clothing – was selling drugs from a residence – which she identified – where he was staying and that he possessed a gun.[5]

In addition to the lack of specificity concerning when the alleged activity had occurred, the record also contains inconsistent testimony as to when the informant reported it to DiNicola. DiNicola testified that she reported it minutes before Coniglio encountered Singleton on the street. By contrast, Coniglio testified that he first learned of the information a few days earlier than May 19th and that within that several-day period, he and other officers had driven by 119 Saratoga Avenue to look for suspicious activity, but had seen none. (Tr. 49-50). He also testified that DiNicola did not mention a gun during their May 19th conversation in which DiNicola told him that the suspect had gone to the store. (Tr. 51, 54). While I believe that neither officer purposefully testified untruthfully, I find that Coniglio's version is the more credible one because it accounts for the surveillance that was conducted on 119 Saratoga Avenue in the days preceding Singleton's arrest on the 19th. While a several day difference may not initially appear to be significant, I note that this case would be considerably easier if the record demonstrated that minutes before the defendant's arrest, a reliable informant had provided information that she had just observed the defendant possess a gun and/or participate in a drug transaction.

**3. Corroboration of Informant's Information:** Turning next to the question of corroboration by police investigation, I do not believe that this consideration adds much to the question of reasonable suspicion. While it is true, as the government emphasizes,

---

[5] This assumption is even stronger considering that the government has not moved to reopen the hearing to offer any such evidence notwithstanding the Court's post-hearing communication to the parties of its view that scant, if any, evidence is contained in the record concerning the informant's basis of knowledge.

that the informant correctly identified the suspect's current location and described generally his

clothing, those details simply identified the suspect and where he was and provided nothing to

corroborate the allegations of his involvement in criminal activity.  As the Supreme Court has

noted:

> An accurate description of a suspect's readily observable location and appearance is of course reliable in this limited sense:  It will help the police correctly identify the person whom the tipster means to accuse.  Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.  The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Florida v. J.L.*, 529 U.S. at 272.

Nor was there anything "predictive" in the nature of the informant's allegations –

such as, where the suspect would be traveling in the future – which, if confirmed, could be

considered corroborative.  *White*, 496 U.S. at 332 ("independent corroboration by the police of

significant aspects of the informer's predictions imparted some degree of reliability to the other

allegations made by the caller"); *Elmore*, 482 F.3d at 180 ("[s]tressing the importance of

predictive information, the [Supreme] Court [has] held that corroboration of some of the

information in the tip allows the police to reasonably infer that the remaining, unverified

information is also true") (citing *Illinois v. Gates*, 462 U.S. at 243-45).  Here, the information

pertained to the suspect's current location (he had "gone to the store") and clothing he was

wearing at the time of the report.

Indeed, the little investigation of the allegations that was conducted yielded

nothing to substantiate them.  As Coniglio testified, although law enforcement officers had

driven by 119 Saratoga Avenue several times in the days preceding May 19th, no suspected drug or firearms activity was observed.

      **C.  Was Singleton's Stop Supported by Reasonable Suspicion?**  In sum, this case appears to present the following question:  Is a reliable informant's conclusory and uncorroborated allegation of criminal activity by an identifiable suspect, unaccompanied by any specific facts from which her basis of knowledge may be inferred, sufficient to establish reasonable suspicion to conduct a *Terry* stop of that suspect?  My analysis of the controlling caselaw reveals the question to be a deceptively difficult one, but one that I answer in the negative on the facts presented in the record before me.

      First, it bears reiteration that the proper framework is an analysis of the totality of the circumstances, rather than a rigid requirement of proof satisfying both the veracity and basis of knowledge inquiries.  In evaluating the totality of the circumstances, this Court begins with the principle articulated by the Second Circuit that "[w]here the informant is known from past practice to be reliable, no corroboration will be required to support reasonable suspicion." *Elmore*, 482 F.3d at 181.  Applying that principle to the case at hand, it is clear that the absence of meaningful corroboration does not, in and of itself, deal a fatal blow to the government's position.

      The more difficult question is whether the absence of any facts concerning the informant's basis of knowledge does.  With respect to this question, I begin by noting that the Second Circuit's recent *Elmore* decision addressed the opposite question:  whether some corroboration is required where the citizen informant's basis of knowledge is known, but her veracity is not?  The Court answered that it is.  *Id.* at 183.  Does it follow inescapably or

20

rationally from that conclusion that the Court would answer the converse question – where

veracity is known, but basis of knowledge is not – in the same manner?  Judging from the

Supreme Court's decisions in *Gates* and *Adams*, I am not sure that it does.

In *Gates*, which dealt with the probable cause standard for search warrants, the

Supreme Court noted:

> If . . . a particular informant is known for the unusual reliability of
> his predictions of certain types of criminal activities in a locality,
> his failure, in a particular case, to thoroughly set forth the basis of
> his knowledge surely should not serve as an absolute bar to a
> finding of probable cause based on his tip.  Likewise, if an
> unquestionably honest citizen comes forward with a report of
> criminal activity – which if fabricated would subject him to
> criminal liability – we have found rigorous scrutiny of the basis of
> his knowledge unnecessary.

*Gates*, 462 U.S. at 233-34 (citations omitted).  This language suggests that in certain cases where

the informant's basis of knowledge is not "thoroughly set forth," that deficiency may be

overcome by evidence of his "unusual reliability."  Even accepting that the quantum of

compensatory evidence need not be as substantial in the context of reasonable suspicion, I find

that the record here permits no determination that the informant was "unusually" reliable.

Although the record shows that the informant had provided reliable information on more than

twenty occasions over six and one-half years, it contains no evidence as to whether and, if so,

how often the informant provided information which proved to be inaccurate.

*Adams* suggests another scenario under which the absence of ample information

about an informant's basis of knowledge will be compensated for by the veracity of the

informant.  There, a reliable informant reported that a man seated in a nearby car in a high-crime

area in the middle of the night was carrying drugs and had a gun at his waist.  *Adams v. Williams*,

21

407 U.S. at 144-45.  Under those circumstances, the Court concluded that reasonable suspicion justified stopping and frisking the suspect, commenting that "when a credible informant warns of a specific impending crime – the subtleties of the hearsay rule should not thwart an appropriate police response."  *Id.* at 147.  Unlike *Adams*, however, this case does not involve a warning of an impending crime; in fact, both officers testified that they had no information that Singleton's trip to the store was in any way related to illegal activity.  Perhaps more importantly, the informant's allegations of criminal activity are unanchored in time.  They may have been based as easily upon observations made or information learned by the informant several weeks, several days or several hours before her initial report to DiNicola.

While I am not prepared to state categorically that the absence of any information as to a reliable informant's basis of knowledge, where it is coupled with the absence of meaningful corroboration, dooms any effort to demonstrate reasonable suspicion, I am not prepared to find that this is the unusual case.  My research has not disclosed any cases determining that reasonable suspicion existed where the allegations of illegality were so conclusory in nature and where so little was known about the basis of knowledge and so little done to corroborate the information.  I do not lightly or easily reach my conclusion that reasonable suspicion was lacking, and I acknowledge that the facts of this case present no reason to doubt the honesty of the officers or the informant.  That said, a simple inquiry by the officers as to the informant's basis for believing that Singleton was dealing drugs and possessed a gun would have revealed whether the information deserved credence, disregard or further investigation.  The fact that the informant provided reliable information on multiple occasions in the past does not justify dispensing with that brief inquiry, in my judgment.

## III.  **Suppression Under** *Wong Sun*

Having concluded that Singleton's stop was not supported by reasonable suspicion, the only question remaining is whether the evidence subsequently obtained during the search of his home and the statements he thereafter made should be suppressed as fruit of the illegal stop.  *See Scopo*, 19 F.3d at 781 ("[a]ny evidence seized based upon an illegal stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed") (internal quotation omitted) (citing *Wong Sun v. United States*, 371 U.S. at 471).  The defense maintains that they should; the government disagrees.

I concur with Singleton that the first issue to be addressed is whether the government should be foreclosed from arguing this doctrine.  Singleton maintained that the hearing proceeded on the assumption by the government, as well as the defense, that *Wong Sun* would apply on the facts of this case.  I do not interpret the record to be as clear as the defense does.

As the record here shows, several adjournments were granted to Singleton to allow him to consider submitting an affidavit to establish standing to challenge his alleged consent to the search.  When he declined to do so, this Court expressed its view that a hearing on the lawfulness of the stop was still required because Singleton was relying on the *Wong Sun* doctrine to seek suppression.  While it would have been preferable for the government to clarify its position at the time, I do not find that it has waived or forfeited its right to challenge Singleton's application of *Wong Sun* to the facts of this case.  To do so would effect a result too harsh to justify on such an unclear record.

23

I do not agree with the government, however, that the record has been adequately developed to resolve the *Wong Sun* question, let alone decide it in favor of the government. Accordingly, this Court shall conduct a further evidentiary hearing at which both parties may have an opportunity to further develop the factual record as it relates to the *Wong Sun* doctrine. Such a hearing shall be held on **May 5, 2008**, at **10:00 a.m.**

In addition, Singleton shall have one final opportunity to submit an affidavit establishing his right to challenge his purported consent to the search of 119 Saratoga Avenue. Such an affidavit shall be filed by no later than **April 29, 2008**.  If a sufficient affidavit is submitted and defendant wishes to challenge the adequacy of his alleged consent, the hearing shall be expanded to develop the factual record as to that issue as well.

## <u>CONCLUSION</u>

For the foregoing reasons, it is my recommendation that the district court determine that Officer Coniglio's encounter with Singleton on May 19, 2006 violated the Fourth Amendment.

            *s/Marian W. Payson*
            MARIAN W. PAYSON
            United States Magistrate Judge

Dated: Rochester, New York
       April   21  , 2008

24

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **<u>Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.</u>**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

          *s/Marian W. Payson*
           MARIAN W. PAYSON
          United States Magistrate Judge

Dated: Rochester, New York
      April   21  , 2008

---

[6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).