UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


                              Plaintiff,

                                                        <u>DECISION AND ORDER</u>

                                                        06-CR-6234L


                    v.

TORRIE SINGLETON,


                              Defendant.
_____


        This Court referred all pretrial matters in this case to United States Magistrate Judge Marian

W. Payson pursuant to 28 U.S.C. § 636(b).  After defendant Torrie Singleton moved to suppress

statements and physical evidence, Magistrate Judge Payson conducted a suppression hearing and,

by Report and Recommendation dated April 21, 2008, she found that Singleton had been subjected

to an unlawful search and seizure in violation of his Fourth Amendment rights.  *See* 2008 WL

1826758.

        The magistrate judge made no recommendation at that time as to whether any statements or

physical evidence should be suppressed, however.  Instead, she conducted a second evidentiary

hearing to determine whether suppression was required under the "fruit of the poisonous tree"

doctrine as set forth in *Wong Sun v. United States*, 371 U.S. 471, 479 (1963).

On November 12, 2008, Magistrate Judge Payson issued a second Report and Recommendation, in which she recommended that defendant's motion to suppress be granted, both as to his statements and the physical evidence. 2008 WL 4935401. The government has filed objections to both the April and November Reports and Recommendations, and defendant has responded to the government's objections. The matter is now before this Court for review.

## BACKGROUND

### I. The Events of May 19, 2006

On May 19, 2006, at around 9:15 p.m., Officer Kenneth Coniglio of the Rochester Police Department received a call from Rochester Police Officer Robert DiNicola, who told Coniglio "that an individual had called him with some information that an individual that lived at 119 Saratoga Avenue was dealing drugs and that individual was out on the street now, possibly walking towards his house." 2008 WL 1826758, at *2. DiNicola also gave him a description of the suspect's clothing and his current location, which was a store on Lyell Avenue.[1]

Upon parking his patrol car in an alley near the intersection of Saratoga and Lyell Avenues, Coniglio observed defendant, whose clothing matched the description that Coniglio had been given by DiNicola, walking northbound on Saratoga. Coniglio drove up and parked his car, and he and his partner got out. Coniglio began walking toward Singleton, who stopped walking, whereupon

---

[1]Coniglio also testified that although DiNicola did not say anything about a gun at that time, DiNicola had told him, "some days previous" to May 19, that an informant had reported that someone was dealing drugs from 119 Saratoga Avenue and had a handgun there. 2008 WL 1826758, at *2.

Coniglio asked him, "Do you got a minute?" Singleton responded, "Sure." Coniglio then told Singleton to put his hands behind his back, which he did, and Coniglio conducted a pat frisk for weapons.

During the pat frisk, Coniglio went through his "standard line of chatter," which included a question about whether Singleton was "on probation or parole." When Singleton stated that he was on parole, Coniglio asked Singleton whether he had a curfew, and Singleton replied, "9 o'clock." *Id.* at *3.

After the pat frisk–which turned up no weapons or contraband–Coniglio asked Singleton for identification, and Singleton gave him a New York State identification card. A records check confirmed that Singleton was on parole, and Coniglio then contacted parole officials, who confirmed that Singleton was in violation of his curfew. Based on that information, Coniglio placed Singleton in the rear of his police car.

Singleton's parole officer, David Galbo, arrived at about 9:40 p.m.[2] Suppression Hearing Transcript ("Tr."), Dkt. #76, at 88. Galbo spoke with Singleton, and obtained his consent to search Singleton's apartment. During the search, the officers found a handgun, along with a quantity of marijuana. Singleton seeks to suppress those items.

At about 10:00 p.m., defendant was formally arrested for violating his curfew. He was taken to the Public Safety Building in Rochester and interviewed by Coniglio. After being advised of his *Miranda* rights, Singleton stated that he understood, and was willing to waive, those rights. He

---

[2]Galbo testified that he had gone to Singleton's apartment between 6:00 and 6:30 a.m. on the morning of May 19 to perform a routine curfew check, and that Singleton was not home at that time. Tr. at 85-86. That was also a curfew violation. Tr. at 88.

subsequently made a number of incriminating statements during that interview, which he also now seeks to suppress.

## II. The Reports and Recommendations

Although familiarity with both Reports and Recommendations is assumed, a brief summary of Magistrate Judge Payson's findings and conclusions will facilitate analysis of the issues before me.

In the April 21, 2008 Report and Recommendation, Magistrate Judge Payson first addressed whether the stop of Singleton, which occurred at around 9:15 p.m. on May 19, 2006, violated Singleton's Fourth Amendment rights. The magistrate judge "agree[d] with the government that ... the encounter [between Singleton and the two police officers on the scene] was consensual" when it began, but she also concluded that "the consensual encounter quickly evolved into a *Terry* stop" when Officer Coniglio directed Singleton to put his hands behind his back, and patted him down. 2008 WL 1826758, at *7; *see Terry v. Ohio*, 392 U.S. 1, 30 (1968).

Magistrate Judge Payson next considered "whether the stop was supported by reasonable suspicion to believe that 'criminal activity may [have] be[en] afoot.'" 2008 WL 1826758, at *7. (quoting *Terry*, 392 U.S. at 30). Although she found that "the informant in this case should be considered credible," *id.* at *8, the magistrate judge added that there was little information in the record concerning the factual basis for the informant's allegations concerning Singleton, or to corroborate those allegations. *Id.* at *9-*10. The magistrate judge stated that whether the informant's allegations were sufficient to establish reasonable suspicion to conduct a *Terry* stop of

Singleton was "a deceptively difficult" question to answer," *id.* at *10, but she concluded that on the facts of this case, there was an insufficient basis to establish such a suspicion. *See id.* at *10-*12.

Magistrate Judge Payson then held a second evidentiary hearing, and issued a second Report and Recommendation, addressing whether the items seized from defendant's apartment, and the statements that he made during the custodial interrogation following his arrest, should be suppressed as fruits of the unlawful *Terry* stop and frisk. After reciting the four factors relevant to that determination–the administration of *Miranda* warnings, the temporal proximity of the arrest and the statements in question, the presence or absence of intervening circumstances, and the purpose and flagrancy of the official misconduct–the magistrate judge found that the only one of those factors that weighed in favor of the government in this case was the last one.

In particular, the magistrate judge noted that although she had determined that the seizure and search of Singleton were unlawful, "the question [was] an extremely close one," and that "[t]he very difficulty this Court faced in reaching its conclusion itself demonstrates that the violation was not a flagrant one." 2008 WL 4935401, at *6. She added that there was nothing in the record to suggest that the officers acted in bad faith, stating, "To the contrary, I find that they acted in the good faith belief that their actions comported with the law." *Id.*

Magistrate Judge Payson found that the other three factors weighed in favor of suppression. She noted that Singleton had not been read his *Miranda* rights, or advised of his right to refuse consent, before the officers requested and obtained his permission to search his residence. In addition, the evidence at the hearing indicated that not much time–perhaps thirty minutes–elapsed

between Singleton's implicit admission to Coniglio that Singleton was out past curfew and Galbo's arrival and procurement of Singleton's consent to search. *Id.*

Based on those factual findings, Magistrate Judge Payson concluded that "Singleton's consent to the search of his residence was the product of the unlawful seizure and was not so attenuated as to dissipate the unconstitutional taint." She therefore recommended that the evidence seized from defendant's residence be suppressed. *Id.*

The magistrate judge also recommended that the statements made by Singleton during his post-arrest custodial interview be suppressed. The magistrate judge concluded that although defendant had by that point been advised of his rights, and though roughly three hours had passed since the initial stop and seizure, Singleton's statements in the interview were nonetheless "the product of his unlawful seizure and the search of his apartment." *Id.* at *8. She found that "Singleton's seizure, the search of his residence and his statements were too closely connected in time and context to break 'the causal chain of illegality.'" *Id.* (quoting *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987)).

## III. Government's Objections

The government first objects to the magistrate judge's finding that the detention of defendant was not supported by reasonable suspicion. The government contends that the statements of the informant in this case were sufficient to justify the officers in stopping and questioning defendant.

Alternatively, the government argues that even if the initial stop of Singleton was unlawful, the seizure of evidence from his residence, and the statements that he later made to Coniglio, were

sufficiently attenuated from any unlawful police conduct to dissipate any "taint," and that defendant's consent to the search of his apartment and his waiver of his rights were knowing and voluntary.

## DISCUSSION

### I. Standard of Review

A district court reviews those portions of a report and recommendation to which a party has timely objected under a *de novo* standard of review. 28 U.S.C. § 636(b)(1)(C). The district court, however, may not reject the magistrate judge's credibility findings without conducting an evidentiary hearing at which the district court has the opportunity to observe and evaluate witness credibility in the first instance. *Cullen v. United States*, 194 F.3d 401 (2d Cir. 1999); *United States v. Carter*, No. 06-CR-6011, 2006 WL 2353562, at *1 (W.D.N.Y. Aug. 15, 2006), *aff'd*, 2009 WL 765004 (2d Cir. Mar. 25, 2009).

The district court may adopt those portions of a report and recommendation to which no objections have been made, as long as no clear error is apparent from the face of the record. *See White v. Fischer*, No. 04-CV-5358, 2008 WL 4210478, at *1 (S.D.N.Y. Sept. 12, 2008). The clearly-erroneous standard also applies if a party makes only "conclusory or general objections, or simply reiterates his original arguments." *Barratt v. Joie*, No. 96-CV-324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002).

After reviewing the Report and Recommendation and the objections thereto, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

## II. Analysis

As the magistrate judge noted, the interaction between Singleton and the officers began as a consensual encounter.  Consensual encounters do not implicate the Fourth Amendment merely because one of the persons involved is a police officer.  *See Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and] by putting questions to him"); *accord Pinto-Montoya v. Mukasey*, 540 F.3d 126, 131-32 (2d Cir. 2008).  Thus, there was nothing untoward about Coniglio's initially approaching Singleton and asking if he could speak with him for a moment, which Singleton agreed to do.

It is undisputed here, though, that the encounter did not remain entirely consensual for long.  At the outset of their conversation, Coniglio directed Singleton to place his hands behind his back, and began conducting a brief pat frisk, during which he asked Singleton a few questions pursuant to his "standard line of chatter."  One of those questions elicited Singleton's statements about being on parole and having a 9:00 curfew, which led to his further detention and eventual arrest.

Under *Terry*, a police officer may detain an individual for brief questioning if the officer has a reasonable suspicion that criminal activity is afoot, and may conduct a limited search to confirm that the individual is not armed.  *See United States v. Colon*, 250 F.3d 130, 134 (2d Cir. 2001).

Reasonable suspicion means that police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. When evaluating whether or not a police officer had reasonable suspicion, a court should consider "the totality of the circumstances." *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

Reviewing *de novo* the magistrate judge's determination that Coniglio lacked a reasonable suspicion to detain Singleton under *Terry*, *see United States v. Arvizu*, 534 U.S. 266, 275 (2002) (standard for appellate review of reasonable-suspicion determinations should be *de novo*); *accord United States v. Simmons*, ___ F.3d ___, 2009 WL 674154, at *3 (2d Cir. 2009), I conclude that Coniglio had an objectively reasonable suspicion that justified the frisk of Singleton.

A central issue in this case is how much weight should reasonably have been given to the information provided here by the informant. In that regard, the Supreme Court has stated that while a police officer may rely on information supplied by a confidential informant to establish reasonable suspicion, the information must "carr[y] enough indicia of reliability to justify the officer's forcible stop .... " *Adams v. Williams*, 407 U.S. 143, 147 (1972). I believe that the information known to the officers justified their brief pat down of Singleton for weapons.

In the case at bar, DiNicola testified that the informant was a "concerned citizen" whom he had known for over six years. She lived near defendant's residence on Saratoga Avenue, which DiNicola described as a "high-crime area" because of its heavy incidence of shootings, drug activity and prostitution. DiNicola stated that the informant "happen[ed] to be on the street all the time," and that she had provided reliable information to DiNicola on a number of occasions about "drug houses,

weapons, guns, stuff like that," which had led to multiple handgun seizures and drug arrests. DiNicola also testified that he had had contact with this informant on over twenty occasions. She was not a paid informant, nor was she facing any criminal charges. 2008 WL 1826758, at *2.

Those facts weigh strongly in favor of the informant's credibility. "The reliability of information provided by a confidential informant can be established if 'the person providing the information has a track record of providing reliable information ... .'" *Warren v. Williams*, No. Civ.A. 304CV537, 2006 WL 860998, at *16 (D.Conn. Mar. 31, 2006) (quoting *United States v. Wagner*, 989 F.2d 69, 72-73 (2d Cir. 1993)). "Typically, and most often in the context of a suppression hearing, an informant's reliability can be established by testimony by a law enforcement officer regarding previous information learned from an informant." *Warren*, 2006 WL 860998, at *16 (citing *United States v. Pena*, 961 F.2d 333, 340 (2d Cir. 1992)).

Thus, while information from an anonymous informant generally requires some sort of corroboration to be considered reliable, *see Florida v. J. L.*, 529 U.S. 266, 270-71 (2000)), "[w]here informants are known[ to the officer], ... a lesser degree of corroboration is required." *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007). Indeed, "[t]he veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *Id.*; *see also United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975) (noting the "peculiar likelihood of accuracy" of a citizen informant's report); *United States v. Smith*, 182 F.3d 473, 483 (6th Cir. 1999) ("information supplied by an informant of proven reliability may be sufficient, standing alone, to demonstrate probable cause") (citing *McCray v. Illinois*, 386 U.S. 300, 302-04 (1967)).

Here, I conclude that, in light of the lengthy and consistent record of this informant's reliability, her statements to DiNicola–which DiNicola relayed to Coniglio–gave rise to an objectively reasonable suspicion that Singleton was involved in selling drugs, and that he possessed a gun. Coniglio was therefore warranted in frisking Singleton at the start of their encounter. *See United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009) (applying test of objective reasonableness to traffic stop); *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) ("In reviewing reasonable suspicion determinations, we look to the totality of the circumstances to see whether the officer had a 'particularized and objective basis' to suspect criminal activity") (quoting *Arvizu*, 534 U.S. at 273)).

As noted, DiNicola had had contact with the informant here on about twenty occasions over a six-year period, during which she had provided reliable information a number of times about "drug houses, weapons, guns, [and] stuff like that." That information had led to multiple handgun seizures and drug arrests. *See United States v. Helton*, 314 F.3d 812, 821 (6th Cir. 2003) (confidential informant's "statements may be treated as trustworthy and reliable, even without further corroboration, based on [informant's] track record," which included providing information for three searches and sixteen arrests, thus affording his statements "a high degree of trustworthiness and reliability"); *Smith*, 182 F.3d at 479 (holding that confidential informant's tip supplied probable cause for the issuance of a search warrant, in part because the informant had provided police with reliable information concerning firearms and narcotics on twenty-six separate occasions in the past).

Furthermore, as stated, the fact that this informant was known to DiNicola is itself some indication of her credibility. In *Adams v. Williams*, 407 U.S. 143, 146-47 (1972), the Supreme Court

held that a police officer acted justifiably in responding to an informant's tip, where the informant was known to him personally and had provided him with information in the past.  In reaching that conclusion, the Court stated that "[t]his is a stronger case than obtains in the case of an anonymous telephone tip," in part because the informant might have been subject to criminal charges for making a false complaint had the tip proved to be incorrect.  *Id.* at 146.  The Court stated that while "this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant, the information carried enough indicia of reliability to justify the officer's forcible stop of Williams." *Id.* at 147.  *See also Florida v. J.L.*, 529 U.S. 266, 270 (2000) (distinguishing between anonymous tip and tip from a "known informant whose reputation can be assessed and who can be held responsible if her allegations turned out to be fabricated"); *Elmore*, 482 F.3d at 180 (same); *United States v. Hayes*, 574 F.Supp.2d 308, 312 n.5 (W.D.N.Y. 2008) ("The fact that the tipster remained anonymous distinguishes this case from that of an identified private citizen informant whose veracity is generally presumed in the absence of circumstances suggesting that they should not be trusted"); *United States v. Vanhoesen*, 552 F.Supp.2d 335, 339 (N.D.N.Y. 2008) ("the fact that [the informant] was not an anonymous informant is a factor worthy of consideration and one that weighs in favor of crediting his information," in part because he "could have faced adverse consequences if his information turned out to be false").

In addition, although the informant did not state on the evening of May 19 that she had seen the suspect carrying a gun, or engaging in unlawful activity, at that particular time, she had previously informed DiNicola that the individual "was dealing drugs" at 119 Saratoga and that he had a handgun.  The connection between illegal drugs and firearms is well established, *see*, *e.g.*,

*United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008), *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004), *cert. denied*, 544 U.S. 990 (2005), and is undoubtedly at least as well known to police officers as to anyone. It was therefore objectively reasonable for the officers here to believe that Singleton may have been carrying a gun on the evening in question. *See United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003) (recognizing that firearms are regularly found on narcotics traffickers), *cert. denied*, 549 U.S. 1260 (2007). The fact that this was known to the officers to be a "high crime area," 2008 WL 1826758, at *2, while not in itself enough to justify stopping Singleton, nevertheless strengthened the reasonableness of the suspicion that Singleton may have been armed and engaged in criminal activity.

I conclude, then, that Coniglio was justified in stopping Singleton initially to converse.[3] Coniglio was likewise justified in asking defendant some basic questions about whether Singleton was carrying any weapons, or whether he was then on probation or parole. *See Arizona v. Johnson*, ___ U.S. ___, 129 S.Ct. 781, 788 (2009) ("An officer's inquiries into matters unrelated to the justification for the ... stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop"); *see also Muehler v. Mena*, 544 U.S. 93, 101 (2005) (officers did not need reasonable suspicion to ask detainee for her name, date and place of birth, or immigration status during valid detention pursuant to execution of search warrant); *United States v. Banks*, 553 F.3d 1101, 1105 (8th Cir. 2009) ("After making an otherwise lawful *Terry* stop, ... an officer may engage in brief questioning on matters even unrelated

---

[3]My finding in this regard renders it unnecessary for the Court to consider the government's contention that Singleton was "free to ... simply walk away" from the encounter with the officers without answering any questions. Government's Objections (Dkt. #81) at 10.

to the original offense if the initial detention is not prolonged by the questions[, a]nd when a suspect's response to an investigatory question raises suspicion unrelated to the original offense, the officer may expand his inquiry to satisfy the suspicion"); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (because officer's "questioning did not prolong the detention while the license check was being performed[, ...] the questioning, regardless of the topic, did not violate the Fourth Amendment"); *United States v. Hunter,* No. 07-CR-265, 2008 WL 2074076, at *2 (W.D.N.Y. May 14, 2008) ("The Supreme Court [has] rejected the notion that questioning a detainee 'constitute[s] a discrete Fourth Amendment event,' unless the questioning prolongs the detention") (quoting *Muehler*, 544 U.S. at 101).

Coniglio was also justified in conducting a pat-frisk of defendant, given the information that the suspect had been reported to be a drug dealer who owned a handgun. *See United States v. Mims*, 237 Fed.Appx. 634, 636 (2d Cir. 2007) (where reliable informant had stated that defendant was likely to be in possession of a handgun and narcotics, officers were justified in approaching defendant and asking him further questions, while taking objectively reasonable steps to protect themselves, including pat-down to search for weapons); *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006) ("a connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous"); *United States v. Clark*, 24 F.3d 299, 304 (D.C. Cir. 1994) (given association between guns and drug dealing, officer did not violate defendant's Fourth Amendment rights by frisking defendant during *Terry* stop, since informant had identified suspect as having drugs). In any event, the frisk of defendant is not directly at issue here, since no contraband or

incriminating items were found as a result of the frisk, nor was it the frisk itself that led to defendant's arrest and the search of his apartment.

In addition, Singleton's admission to Coniglio that he was on parole and had a 9:00 p.m. curfew gave rise to probable cause to believe that Singleton was at that moment violating the conditions of his parole, which justified his further detention in Coniglio's police car and formal arrest a short time later after Parole Officer Galbo arrived. *Cf. Teague v. Gallegos*, No. 06-CV-2005, 2007 WL 3232082, at *3 (D.Colo. Oct. 30, 2007) ("Having determined that [parolee] had visitors in the home past his curfew, Officer White had probable cause to arrest him for the violation of the terms of his parole"); *see also Coleman v. City of New York*, No. 03-CV-4921, 2009 WL 705539, at *3 (E.D.N.Y. Mar. 16, 2009) (stating that pursuant to New York's parole regulations, "[i]n the context of a parole violation arrest, the probable cause requirement is replaced with a lower reasonable cause standard") (citations omitted); *but see Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) (discussing, in dictum, parolee's "clearly established right to be free from arrest [for violating terms of his parole] in the absence of probable cause").

As to the search of Singleton's apartment, it is undisputed that Singleton orally gave Galbo his consent to the search, and that he signed a form memorializing that consent. Defendant does not appear to have challenged the voluntariness or validity of that consent itself, apart from the fact that it was given during what defendant argues was his unlawful detention.

In her April Report and Recommendation, Magistrate Judge Payson stated that "the voluntariness of the consent is not before this Court because Singleton has not submitted an affidavit establishing standing to challenge the search, despite being offered multiple opportunities by the

Court to submit an affidavit demonstrating the requisite privacy interest in the premises searched." 2008 WL 1826758, at *3 n.3. She also gave him "one final opportunity to submit an affidavit establishing his right to challenge his purported consent to the search of 119 Saratoga Avenue." *Id.* at *13. The magistrate judge gave defendant until April 29, 2008 to file such an affidavit. *Id.*

Although defense counsel sought and obtained a one-week extension to file an affidavit regarding the consent issue, *see* Dkt. #62, it does not appear that he ever did file such an affidavit. At the suppression hearing, defense counsel took the position that Singleton's giving of consent to search on the night of his arrest was "a non-event" because, as a condition of his release on parole, Singleton had already signed a form indicating that he "underst[ood] that [his] person, residence and property [we]re subject to search and inspection," and that he "w[ould] permit [his] Parole Officer to visit [him] at [his] residence and/or place of employment and [that he would] permit the search and inspection of [his] person, residence and property." 2008 WL 4935401, at *3. Defense counsel stated that given the existence of that document, "there was no consent needed [for the search]. The consent already existed." Tr. at 135.

Defendant's position, then, is not that there was no consent, or that his consent was involuntary or otherwise ineffective, but that his consent is irrelevant because there would not have been any search in the first place had it not been for the purportedly unlawful detention of defendant. In other words, defendant appears to rely solely on the "fruit of the poisonous tree" doctrine, and the magistrate judge's recommendation that the physical evidence be suppressed is likewise premised on that ground, not on any separate issue concerning defendant's consent.

My finding that the stop and detention of defendant was lawful renders it unnecessary to conduct a *Wong Sun* analysis, however. As stated, no separate challenge to the voluntariness of defendant's consent appears to be presented here, and I also find that the search of Singleton's apartment was lawful pursuant to his consent.[4]

I also conclude that Singleton's consent on the night of May 19, 2006, though effective, was indeed unnecessary, and that the search would have been lawful even in the absence of that consent. Singleton had already consented to allow his apartment to be searched by his parole officer, as a condition of his parole.

Furthermore, even if–as defendant now argues, *see* Dkt. #85 at 19–the consent that Singleton gave pursuant to his parole status did not amount to "an unrestricted consent to any and all searches whatsoever or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures," *People v. Huntley*, 43 N.Y.2d 175, 182 (1977) (quoted in *United States v. Watts*, 301 Fed.Appx. 39, 42 n.2 (2d Cir. 2008)), the totality of the circumstances here were such that no further consent was needed.[5]

---

[4]I note that the fact that Singleton was in custody at the time that he gave his consent is no bar to a finding of voluntariness. *See United States v. Snype*, 441 F.3d 119, 131 (2d Cir.) ("While more than mere acquiescence in a show of authority is necessary to establish the voluntariness of a consent, the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness") (internal quotation marks and citations omitted), *cert. denied*, 549 U.S. 923 (2006); *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary); *United States v. Figueroa*, No. 04-CR-6106, 2005 WL 351935, at *4 (W.D.N.Y. Feb. 11, 2005) ("The fact that defendant was handcuffed when he gave his consent does not automatically render the consent involuntary") (citing *United States v. Crespo*, 834 F.2d 267, 271 (2d. Cir. 1987), *cert. denied*, 485 U.S. 1007 (1988)).

[5]Contrary to defendant's assertion that "[t]he Government now raises for the first time"
(continued...)

Both the Supreme Court and the Second Circuit have long recognized that "a parolee does not enjoy 'the absolute liberty to which every citizen is entitled, but only (a) conditional liberty properly dependent on observance of special parole restrictions.'" *United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). Parolees "are different from other citizens and they may, in certain circumstances, possess fewer constitutional rights. This difference in status and protection is based on the fact that parolees have been convicted of a crime and are still serving their sentence while on parole, albeit not within prison walls." *Id.*

That difference extends to searches. "A parolee's reasonable expectations of privacy are less than those of ordinary citizens, and are even less so where ... the parolee, as a condition of being released from prison, has expressly consented to having his residence searched by his parole officer." *United States v. Massey*, 461 F.3d 177, 179 (2d Cir. 2006) (citations omitted), *cert. denied*, 549 U.S. 1136 (2007).

In *Samson v. California*, 547 U.S. 843, 846 (2006), the Supreme Court held that a "suspicionless" search of parolee did not violate the Fourth Amendment where the parolee had consented to be searched "at any time of the day or night, with or without a search warrant and with or without cause" as a condition of his parole. Whether *Samson* has effectively overruled prior Second Circuit case law assessing the "reasonableness" of a parole search under *People v. Huntley*, 43 N.Y.2d 175 (1977), remains an open question. *See United States v. Watts*, 301 Fed.Appx. 39, 42

---

[5](...continued)
the argument that Singleton's status as a parolee rendered the search lawful, *see* Defendant's Response (Dkt. #85) at 16, the government did in fact raise this argument before the magistrate judge. *See* Government's Supplemental Submission with Respect to Suppression Hearing (Dkt. #54) at 13.

n.2 (2d Cir. 2008) (finding it unnecessary to decide question because parole officer's search of defendant's residence was rationally related to parole officer's duty to determine whether defendant was violating conditions of parole); *United States v. Justiniano*, No. 07-CR-6024, 2008 WL 919626, at *5-*7 (W.D.N.Y. Mar. 20, 2008) (same); *but see Massey*, 461 F.3d at 180 ("Th[e New York] consent to search is, for all practical purposes, indistinguishable from the 'waiver' apparently signed in *Samson* in the form prescribed by California law") (Miner, J., concurring).

In any event, the search here was reasonable under the circumstances. The officers at the scene had learned that defendant was on parole, and that he was in apparent violation of his curfew, all of which was confirmed when they called for a parole officer and when Galbo arrived. In addition, Coniglio had information indicating that Singleton may have been dealing drugs out of 119 Saratoga Avenue, and that Singleton possessed a firearm. Taken in combination, those facts justified the search of Singleton's apartment, irrespective of any consent that Singleton gave at that time. *See United States v. Newton*, 369 F.3d 659, 666 (2d Cir.) (once parole officer had information that defendant possessed a gun at his residence and used it to threaten others, officer was entitled to search defendant's apartment), *cert. denied*, 543 U.S. 947 (2004); *United States v. Bennett*, No. 05-CR-6050, 2005 WL 2709572, at *7-*8 (W.D.N.Y. Oct. 21, 2005) (parole officer's search of defendant's residence was reasonably and rationally related to officer's duties, based on circumstances–including known informant's allegation that he had seen defendant in possession of a gun–indicating that defendant was in violation of his parole and was engaging in unlawful activity); *United States v. Figueroa*, No. 04-CR-6106, 2005 WL 351935, at *4 (W.D.N.Y. Feb. 11, 2005) (suppression of ammunition found during search of defendant's residence was not warranted, since

"the defendant had previously consented to have his residence searched when he signed the parole conditions of release," and the officer's "search of defendant's home was reasonably related to his duties as Figueroa's parole officer," since officer "had received specific information that Figueroa was in possession of and had fired a rifle at his residence"); *Rodriguez v. United States*, No. 03 CIV. 4204, 2004 WL 3035447, at *3 (S.D.N.Y. Dec. 29, 2004) (parole officers' warrantless search of defendant's apartment, based on information provided by police detectives that he was violating several conditions of his parole, was reasonable under Fourth Amendment).

With respect to Singleton's statements at the Public Safety Building following his arrest, it does not appear that defendant challenges the admissibility of those statements on any grounds other than his initial seizure. As with the physical evidence seized from his apartment, the magistrate judge's recommendation that the statements be suppressed, and defendant's arguments in favor of suppression, are based not on any independent constitutional infirmity surrounding those statements, but on the lack of attenuation between the statements and the initial stop and detention of defendant, which led to his eventual arrest and custodial interrogation.

I see no basis for suppression of those post-arrest statements. Singleton was given his *Miranda* warnings prior to making the statements, and there is nothing in the record to suggest that his waiver of his rights and decision to speak were anything other than knowing and voluntary.

**CONCLUSION**

The Report and Recommendation entered on April 21, 2008 (Dkt. #60), and the Report and Recommendation entered on November 12, 2008 (Dkt. #79) are rejected. Defendant's motion to

suppress statements and physical evidence (Dkt. #21) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       April 21, 2009.